UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| JAMES GILLIS, | ) |
| | ) |
|     Plaintiff, | ) |
| v. | ) |
| | ) |
| UNITEDHEALTH GROUP, INC., | ) |
| UNITED HEALTHCARE SERVICES, INC. | )  CIVIL ACTION NO. 4:18-cv-00108 |
| and UNITED BEHAVIORAL HEALTH | ) |
| operating as OPTUMHEALTH | ) |
| BEHAVIORAL SOLUTIONS, | ) |
| | ) |
|     Defendants. | ) |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff James Gillis ("Plaintiff") files this Original Petition against Defendants UnitedHealth Group, Inc. ("UHG"), United Healthcare Services, Inc. ("UHS"), and United Behavioral Health, operating as OptumHealth Behavioral Solutions ("UBH" and collectively, "Defendants") seeking relief from Defendants for breach of fiduciary duty under section 502(a)(3) of Employee Retirement Income Security Act. Plaintiff seeks recovery of surcharge damages, as authorized by the Fifth Circuit Court of Appeals, recoverable court costs, and attorneys' fees, among all other relief available at law and in equity. In support of this Complaint, Plaintiff respectfully shows the Court the following:

### I.    PARTIES AND SERVICE

1. Plaintiff James Gillis is an individual who resides in Van Zandt County, Texas. Plaintiff is a resident and citizen of the State of Texas.

2. Defendant UnitedHealth Group, Inc. is a Delaware Corporation whose principal place of business is located in Minnesota. This Defendant may be served with citation and process through

its registered agent The Corporation Trust Company located at Corporate Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

3. Defendant United Healthcare Services is a corporation organized under the laws of Minnesota with its principle place of business located in Minnetonka, Minnesota.  This Defendant may be served with citation and process through its registered agent CT Corporation System located at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

4. Defendant United Behavioral Health, operating as OptumHealth Behavioral Solutions, is a corporation organized under the laws of California with its principle place of business located in San Francisco, California. This Defendant may be served with citation and process through its registered agent CT Corporation System located at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## II.     JURISDICTION AND VENUE

5. Subject matter jurisdiction is proper under 28 U.S.C. § 1331.

6. Under 28 U.S.C. § 1391(b), venue is proper in this judicial district because a substantial part of the events giving rise to the claims of this action occurred in this district and division. Defendants' intentional and tortious acts were directed toward and have caused injury and death to Madison Gillis in this division and district – namely, Fannin County.

7. The Court has personal jurisdiction over all Defendants herein because the acts complained of were committed in whole or in part by the Defendants in Texas, and the Defendants' intentional and tortious acts were directed toward and have caused injury and death to Madison Gillis in Fannin County.

8. This Court also has personal jurisdiction over Defendants in this Court because Defendants conduct significant operations in this state.  Defendants issued a workplace benefit policy to Raytheon Company employees, an entity with multiple places of business in the DFW

metroplex alone. By doing so, Defendants undertook to insure Plaintiff's dependents in the State of Texas. Furthermore, two of the denial of claims letters were authored in Texas by Texas medical practitioners, both in Houston, Texas. Accordingly, the fraudulent coverage analysis engaged in by Defendants, as specified in detail below, occurred in the State of Texas, subjecting Defendants to personal jurisdiction in this State. In summary, there is specific personal jurisdiction over Defendants that exists because Defendants' tortious activities occurred in the State of Texas, they undertook to insure individuals in Texas, and they hired and utilized Texas residents to perform the fraudulent analysis the subject of this suit.

9. Moreover, Defendants' extensive contacts in this jurisdiction through, among other things, insuring multitudes of individuals in this State and engaging in systematic activities herein, subject Defendants to general personal jurisdiction in this State.

### III.    FACTS APPLICABLE TO ALL COUNTS

10. This case arises from a broken promise that cost Madison Gillis, a fifteen-year-old girl, her life.

11. Breaching the promise allowed Defendants to keep money for themselves that should have been used to help Madison, who suffered from a life-threatening affliction.

12. As evidenced by this breach and others identified in recent class action filings against Defendants and their affiliates, Defendants have a systemic problem with breaching their fiduciary duties if doing so will net them short-term financial gain.

13. In this case, Defendants agreed to provide Madison mental health and substance abuse insurance coverage under a policy issued to her father, James Gillis. Ultimately, Defendants refused to keep their promise, generated a pre-text to deny coverage, and denied every appeal.

14. Madison's father cashed out his 401k in an effort to save his daughter by paying for the treatment she needed, but the depletion of his working-class retirement account was insufficient

to keep Madison in the treatment program for long.  When her father ran out of money, Madison was discharged from her in-patient facility, Sundown Ranch, after 70 days.  Defendants then rejected Plaintiff's request for coverage of day treatment coverage.

15. Madison died on December 11, 2016.

16. She died after huffing computer cleaning spray, a type of substance abuse well known to her doctors at Sundown Ranch.

17. In a cruel twist of bureaucratic irony, nine days after her death, her father received a letter denying his coverage appeal, affirming Defendants' manifestly erroneous conclusion that Madison was not a danger to herself.

***

18. Madison suffered with significant substance abuse problems – specifically, she suffered from cannabis use disorder, inhalant use disorder, other substance use disorder, combination of substance use disorder, major depressive disorder, recurrent, sever with psychotic features, anxiety disorder, NOS, and insomnia.

19. Following a February 9, 2016 incident at school relating to the possession of drug paraphernalia, she was admitted to Texas Health Behavioral Health Hospital in Arlington.  At the urgent insistence of her doctors at Texas Health, who recognized the serious nature of Madison's affliction, she was referred to Sundown Ranch, an in-patient residential rehabilitation facility tailored to address significant substance abuse and co-occuring mental disorders with children.

20. The Texas Health doctor's instruction to Madison's family was to take her to Sundown Ranch immediately and without delay to obtain in-patient treatment for her substance abuse issues.  Defendants reviewed documents reflecting the urgent nature of the instruction to provide Madison with in-patient treatment.  Indeed, Madison's medical records included information

that Madison was at a risk of suicide, as she had an "active plan to OD on pills or whatever she can get her hands on."

21. Madison's family immediately followed her doctor's instruction and had her admitted to Sundown Ranch.

22. Despite the urgency of the Texas Health doctor's instruction that Madison receive in-patient treatment, and despite the troubling information relating to Madison's contemplation of suicide, Madison was a patient for just *six days* before Defendants summarily determined that she no longer required further coverage for in-patient treatment. Defendants claimed that "[a]fter talking with your doctor's *assistant*, you have made good progress and no longer need the type of care provided in this setting. While you continue to face challenges as you work on recovery, you have progressed to the point that you are not in immediate danger of hurting yourself." (emphasis added). Essentially every further denial letter would include some aped version of this conclusory proclamation, as if its repeated incantation made it true.

23. On February 23, 2016, due to Madison's serious and potentially harmful mental condition, Sundown Ranch urgently requested – rather, begged for – additional coverage for continued treatment of Madison. Cherye C. Callegan, MD confirmed that Sundown Ranch presented detailed clinical information showing that Madison had significant depression and anxiety and that Madison had identified trauma which she reported was a trigger for her drug use. Sundown Ranch confirmed to Defendants that Madison had not yet worked through the trauma, was having significant cravings, and had not yet developed coping skills to remain sober from drugs and abstain from self-harming behavior.

24. Despite this clinical information, and relying solely on a purported conversation with an unidentified doctor's assistant, Defendants made the self-serving determination to deny Madison the coverage she was entitled to, and which she desperately needed. Every doctor with whom James

Gillis spoke about his daughter's condition confirmed that she needed continued coverage – no one has been able to identify the purported "doctor's assistant" that allegedly made a claim about Madison's health that was – a claim that was manifestly untrue.

25. In summary, by claiming reliance on an unidentified doctor's assistant statement, which bore no relation to the reality of Madison's condition, and by choosing to reject the clinical evidence provided by the medical doctors at Sundown Ranch, Defendants intentionally chose to engage in a fraudulent pretext designed to avoid providing coverage.

26. Madison was discharged from Sundown Ranch after the funds from her father's 401k were exhausted.  James Gillis' lifetime of saving for retirement could only keep Madison in the treatment Defendants wrongfully denied for 63 days.  During that time, 42 days into her treatment, Madison's counselor concluded "that Madison will need more time in treatment."

27. Then, after having improperly rejected Madison's in-patient treatment, Defendants rejected her partial hospitalization/day treatment coverage.  On May 12, 2016, Defendants baldly and falsely concluded that "your child has progressed to the point that she is not in immediate danger of hurting herself."

28. Five days before Christmas 2016, Defendants denied Plaintiff's final coverage appeal, concluding, yet again, that Madison was not a danger to herself from her substance abuse problem – she had died nine days earlier as a direct and proximate result of Defendants' failure to provide the coverage they promised.

***

29. Defendants were recently sued in a class action lawsuit that alleged that Defendants developed their own Level of Care ("LOC") guidelines that Defendants use to determine whether any given level of mental health treatment is covered by the health insurance plans that Defendants are charged with administering.  Among the LOC Guidelines authored by Defendants are those for

"Acute Inpatient" and "Residential Treatment." Plaintiff timely opted out of the class. On information and belief, Madison's coverage decision was negatively impacted by these improper LOCs.

30. Defendants' LOC Guidelines for Acute Inpatient treatment (2013) provide that "[a]n acute inpatient unit is a secured and structured hospital-based service that provides 24-hour nursing care and monitoring, assessment and diagnostic services, treatment, and specialty medical consultation services with an urgency that is commensurate with the member's current clinical need." Moreover, these guidelines expressly state that an acute inpatient level of care is medically necessary when "the member is at imminent risk of serious harm to self or others," as demonstrated by suicidality, assaultiveness, psychosis, and grave disability. Defendants' guidelines recognize that care in a residential treatment facility – as opposed to an acute inpatient hospital – is appropriate for patients who do not require 24-hour nursing care and monitoring and who are not an imminent risk of serious harm to themselves or others. Indeed, mentally ill patients at "imminent danger to themselves/others" must, by operation of laws throughout the country, be involuntarily confined to psychiatric hospitals and would in no way qualify for intermediate levels of care like residential treatment.

31. Thus, Defendants' LOC Guidelines for Mental Health Conditions: Residential Treatment (2013), explains that "[r]esidential services are delivered in a facility or a freestanding Residential Treatment Center that provides overnight mental health services to members who do not require 24-hour nursing care and monitoring offered in an acute inpatient setting but who do require 24-hour structure." These guidelines make it clear that residential treatment is only appropriate if the patient "is not at imminent risk of serious harm to self or others," precisely because such patients should be admitted to a hospital.

32. In order to qualify for coverage under these guidelines, a patient must meet one of three criteria: (a) the member is experiencing a disturbance in mood, affect, or cognition resulting in behavior that cannot be safely managed in a less restrictive setting; (b) there is an imminent risk that severe, multiple and/or complex psychosocial stressors will produce significant enough distress or impairment in psychological, social, occupational/educational, or other important areas of functioning to undermine treatment in a lower level of care; or (c) the member has a co-occurring medical disorder or substance use disorder which complicates treatment of the presenting mental health condition to the extent that treatment in a Residential Treatment Center is necessary. Additionally, these guidelines call for denial of coverage if treatment "can be safely provided in a less intensive setting." Defendants' Level of Care Guidelines, Continued Service Criteria (2013), similarly specifies that coverage should be denied for any level of care unless a patient can prove that she will "imminent[ly]" suffer a "significant deterioration in functioning" if treated at a lower level of care.

33. Although Defendants promulgated revised "2014 Level of Care Guidelines, Residential Treatment Center," these revised guidelines continue to require evidence that "factors leading to admission cannot be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors."

34. Defendants have also developed Coverage Determination Guidelines ("CDG") for mental health disorders, including a 2012 CDG for Residential Treatment Center for Major Depressive Disorder and a 2013 CDG for Treatment of Major Depressive Disorder and Dysthymic Disorder. These guidelines define "residential treatment facilities" in the same way as Defendants' LOC Guidelines for Mental Health Conditions: Residential Treatment (2013). Defendants' 2012 and 2013 CDGs further provide that coverage for residential treatment should be discontinued unless the

claimant provides "compelling evidence that continued treatment in the current level of care is required to prevent acute deterioration or exacerbation of the [claimant's] current condition." (emphasis added).

35. The 2012 CDG and 2013 CDG apply the same admission criteria as that identified in Defendants' LOC Guidelines for Mental Health Conditions: Residential Treatment (2013), with one notable exception. Although prevailing standards of care with respect to mental health treatment did not change between April 2012 and July 2013, the dates when Defendants published their 2012 CDG and its 2013 CDG, Defendants entirely excised the following language from their 2012 CDG:

> Intermediate or long-term residential services may be available with less intensity or less intensive staff support to members who are recovering from severe and/or chronic MDD.
>
> Intermediate or long-term residential services for patients who are recovering from severe and/or chronic MDD may include psychotherapy, pharmacotherapy, and other interventions aimed at supporting recovery such as the development of recovery plans and advance directives, strategies for identifying and managing early warning signs of relapse, development of self-management skills, and the provision of peer support services.
>
> In cases where there is an unsupportive or high risk living situation undermining the patient's recovery efforts, intermediate or long-term residential services may be provided for continued stabilization and treatment.

36. Generally accepted standards of assessing the appropriate level of mental healthcare for minors, such as Madison Gillis, are promulgated by the American Academy of Child and Adolescent Psychiatry ("AACAP") and by the American Association of Community Psychiatrists ("AACP").

37. Generally accepted standards of assessing the appropriate level of mental healthcare for adults are promulgated by AACP. These standards are publicly available. Defendants acknowledged, in a document entitled "Guideline Evidence Base for Level of Care Guidelines," that AACAP and AACP set the generally recognized criteria for mental health residential treatment levels of care. In the same document, Defendants assert that the "evidence base" that supports its

Mental Health: Residential Treatment-related LOCs are the AACAP and AACP standards. Similarly, in its "Introduction to the 2014 Level of Care Guidelines," Defendants assert that its guidelines "reflect [Defendants'] understanding of current best practices in care" and that using those guidelines "reduces undesirable variation from evidence-based practice." In fact, however, Defendants' guidelines are inconsistent with, and much more restrictive than, evidence-based generally accepted standards of care.

38. AACAP's Practice Parameter for the Assessment and Treatment of Children and Adolescents With Depressive Disorders explains that the appropriate level of care is driven by a multitude of considerations, including "the subject's age and cognitive development, severity and subtype of depression, chronicity, comorbid conditions, family psychiatric history, family and social environment, family and patient treatment preference and expectations, cultural issues, and availability of expertise in pharmacotherapy and/or psychotherapy." AACAP adds that "the decision for the level of care will depend primarily on level of function and safety to self and others, which in turn are determined by the severity of depression, presence of suicidal and/or homicidal symptoms, psychosis, substance dependence, agitation, child and parents' adherence to treatment, parental psychopathology, and family environment."

39. The Child and Adolescent Level of Care Utilization System (CALOCUS), now also known as CASII, is a "dimensional rating system used to determine the intensity of a child or adolescent's service needs" developed by AACAP and AACP. CALOCUS has six dimensions: (1) risk of harm; (2) functional status; (3) co-morbidity; (4) recovery environment; (5) resiliency and treatment history; and (6) acceptance and engagement. "Each dimension has a five-point rating scale, from least to most severe. For each of the five possible ratings within each dimension, a set of criteria is clearly defined. Only one criterion needs to be met for that rating to be selected, and for each dimension, the highest rating in which at least one of the criteria is met is the rating that should

be assigned." A rating of 4 out of 5 in any of the first three dimensions automatically necessitates placement in residential treatment, independent of any other factors. CALOCUS notes, "[i]n most cases, the higher level of care should be selected, unless there is a clear and compelling rationale to do otherwise."

40. Similarly, the Level of Care Utilization System for Psychiatric and Addictive Services ("LOCUS"), developed by AACP for use in adult populations, notes: "[T]he highest score in which it is more likely than not that at least one criterion has been met should generally be assigned. The result will be that any errors will be made on the side of caution . . . **In most cases, the higher level of care should be selected, unless there is a clear and compelling rationale to do otherwise.**" (emphasis added). CALOCUS explicitly adds that "it may be desirable for a child or adolescent to remain at a higher level of care to preclude relapse and unnecessary disruption of care, and to promote lasting stability."

41. Prolonged residential treatment is in fact the normal prescribed course of treatment for children and adolescents suffering from mental illness. According to SAMHSA, the average length of stay in a residential treatment center for children with mental illness is over six months. Defendants' LOCs and CDGs related to residential treatment for mental illness are inconsistent with generally accepted standards of care in four key respects.

   a. **First**, Defendants' guidelines require a patient to demonstrate by "compelling evidence" that residential treatment is necessary to prevent "acute" deterioration of condition. Generally accepted standards of care, in contrast, call for residential treatment unless there is "clear and compelling" evidence that a lower level of care is more appropriate (i.e., the burden of proof is reversed), do not condition residential treatment on the acute risk of deterioration, and instead focus on the long-term benefits of residential treatment, recognizing that a multi-month regimen of such treatment is often necessary to address chronic conditions and promote lasting stability.

   b. **Second**, Defendants' guidelines require a patient to demonstrate the she has experienced "acute changes" in her condition or circumstances that now warrant residential treatment, even though generally accepted standards articulate no such requirement and call for residential treatment when chronic symptoms are present.

  c. **Third**, Defendants' guidelines ignore generally accepted and evidence-based assessment protocols and rating systems for determining whether residential treatment is appropriate.

  d. **Fourth**, Defendants' guidelines do not distinguish between adult and adolescent patients, and therefore ignore generally accepted standards of care which recognize adolescents' need for different treatment consistent with their level or maturity and need for continuing development.

42. In the present case, on information and belief, these four failures resulted in an improper coverage determination. Specifically, Madison suffered under the first failure because the burden to establish coverage was reversed, placing Madison at an improper disadvantage in obtaining the coverage she required. Second, according to these requirements, Madison was required to show an "acute change," though such a requirement is contrary to industry and federal guidelines. Third, the guidelines improperly ignored generally accepted and evidence-based assessment protocol for Madison, which, on information and belief, would have required further coverage and treatment. Fourth, as a minor, Madison was improperly disadvantaged by Defendants' requirements, which are designed for adults and which fail to accommodate special issues related to children suffering from mental health issues.

43. Based on the foregoing, Plaintiff brings the following claim.

## IV.   CLAIM

**COUNT ONE: BREACH OF FIDUCIARY DUTY.**

44. Plaintiff hereby incorporates and realleges the matters set forth in the preceding paragraphs as if set forth at length.

45. This count is brought pursuant to 29 U.S.C. § 1132(a)(3)(B).

46. As an ERISA fiduciary, and pursuant to 29 U.S.C. Section 1104(a), Defendants are required to discharge their duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and their beneficiaries" and paying

reasonable expenses of administering the plan. Defendants must do so with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plan it administers. Defendants must conform their conduct to a fiduciary duty of loyalty and may not make misrepresentations to their insured.

47. As entities responsible for making mental health and substance abuse benefit determinations under Plaintiff's Plan, and responsible for developing internal practices and policies to facilitate such determinations, Defendants are ERISA fiduciaries.

48. In this case, Defendants breached their fiduciary duty to Plaintiff in two distinct ways.

49. First, Defendants generated then purported to rely on a fraudulent pre-text in an effort to improperly deny coverage.

50. After Madison Gillis was admitted to Texas Health Behavioral Health Hospital in Arlington, her doctors urgently referred her to Sundown Ranch, an in-patient residential rehabilitation facility tailored to address significant substance abuse problems with children.

51. Despite the urgency of the Texas Health doctor's instruction that Madison receive in-patient treatment, Madison was a patient for just *six days* before Defendants summarily determined that she no longer required further coverage for in-patient treatment. Defendants claimed that "[a]fter talking with your doctor's *assistant*, you have made good progress and no longer need the type of care provided in this setting. While you continue to face challenges as you work on recovery, you have progressed to the point that you are not in immediate danger of hurting yourself." (emphasis added).

52. On February 23, 2016, due to Madison's serious and potentially harmful mental condition, Sundown Ranch doctors urgently sought additional coverage for her continued treatment. Sundown Ranch presented detailed clinical information showing that Madison had significant

depression and anxiety and that Madison had identified trauma which she reported was a trigger for her drug use. Sundown Ranch confirmed to Defendants that Madison had not yet worked through the trauma, was having significant cravings, and had not yet developed coping skills to remain sober from drugs and abstain from self-harming behavior – in short, she needed further treatment there.

53. Despite this, relying solely on a purported conversation with a doctor's assistant, Defendants made the self-serving determination to deny Madison the coverage she was entitled to, and which she desperately needed. Every doctor with whom James Gillis spoke about his daughter's condition confirmed that she needed continued coverage – no one has been able to identify the purported "doctor's assistant" that allegedly made a claim about Madison's health that was manifestly untrue.

54. In summary, by claiming reliance on an unidentified doctor's assistant statement, which bore no relation to the reality of Madison's condition, and by choosing to reject the clinical evidence provided by the medical doctors at Sundown Ranch, Defendants intentionally chose to engage in a fraudulent pretext designed to avoid providing coverage.

55. Madison was discharged from Sundown Ranch after the funds from her father's 401k were exhausted. James Gillis' lifetime of saving for retirement could only keep Madison in the treatment Defendants wrongfully denied for 63 days.

56. Madison died on December 11, 2016 as a direct and proximate result of Defendants' failure to provide the coverage they promised.

57. Second, Defendants also violated their fiduciary duties by promulgating the restrictive level of care and coverage determination guidelines discussed herein. Despite the fact that the health insurance plans that insure Plaintiff provide for insurance coverage for residential treatment, the fact that generally accepted standards of care are widely available and well-known to Defendants, and that fact that Defendants asserted that their guidelines were consistent with those

that are generally accepted, Defendants developed guidelines that are far more restrictive than those that are generally accepted. In doing so, Defendants did not act "solely in the interests" of its participant and beneficiary for the exclusive purpose of providing benefits. It did not utilize the "care, skill, prudence, and diligence" of a "prudent man" acting in a similar capacity. It did not act in accordance with the terms of Plaintiff's Plan and in doing so improperly denied Plaintiff's claim.

58. In addition and/or the alternative to Defendants' fraudulent coverage analysis, on information and belief, Defendants' improper LOC's proximately caused and/or contributed to Plaintiff's injury.

59. Plaintiff may pursue this claim for breach of fiduciary duty and seek surcharge in this matter because no other relief is available or adequate under the facts giving rise to the breach of fiduciary duty cause of action. Specifically, merely requiring the provision of plan benefits would be inadequate in this matter, as the actions of Defendants have caused the death of Madison Gillis. Accordingly, it would be of no benefit to require that Defendants change their coverage position – the damage is done and cannot be undone. Moreover, a recovery of only the plan benefits improperly denied would provide a windfall to Defendants, as that amount would fail to require Defendants to pay prospectively the amounts for in-patient, then out-patient, then subsequent lifetime treatment, that Defendants would otherwise have incurred had Madison lived. In equity, Defendants are not permitted to retain the benefits of their breach of fiduciary duty. In short, Defendants' actions alleged hereunder constitute extraordinary circumstances within the meaning of that term as construed in this Circuit.

60. In summary, Defendants significantly and deliberately misled the beneficiaries about the terms of the plan, the diligence Defendants performed in considering Madison's condition, and otherwise. As such, the beneficiaries may bring suit for breach of fiduciary duty.

61. As a result of Defendants' breaches of fiduciary duty, Plaintiff requests the relief identified herein.

## V. DEMAND FOR JURY TRIAL

62. Plaintiff demands a trial by jury.

## VI. REQUEST FOR RELIEF

63. Considering the premises, Plaintiff respectfully requests that upon trial this Court enter a judgment in favor of Plaintiff against Defendants for the following relief:

　a. Ordering Defendants to pay Plaintiff a surcharge in an amount equivalent to:

　　　i. the revenue improperly retained by Defendants in connection with their avoidance of paying future and due insurance proceeds on behalf of Madison Gillis;

　　　ii. the out of pocket losses suffered by Plaintiff including, but not limited to, Plaintiff's loss of inheritance;

　　　iii. the out of pocket losses suffered by Plaintiff including, but not limited to the loss of his retirement fund; and

　　　iv. all other equitable relief available to Plaintiff;

　b. Awarding all relief of the type that would have typically been available in a traditional court of equity (*see, e.g., Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 450 (5th Cir. 2013));

　c. Awarding all "make whole" damages to the extent such are authorized under *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 450 (5th Cir. 2013);

　d. Awarding Plaintiff's reasonable costs and expenses for this action, including reasonable counsel fees, in an amount to be determined by the Court, pursuant to 29 U.S.C. 1132(g);

　e. Granting such other and further relief as is just and proper; and

　f. Such other and further relief, at law or in equity, to which Plaintiff may be entitled and which this Court deems just and fair.

Respectfully submitted,

By: /s/ *Peyton J. Healey*
    Peyton J. Healey
    State Bar No. 24035918
    peyton@powerstaylor.com

    POWERS TAYLOR LLP
    Campbell Centre II
    8150 North Central Expressway
    Suite 1575
    Dallas, Texas 75206
    Phone:  214.239.8900
    Fax:  214.239.8901

    **COUNSEL FOR PLAINTIFF**