UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| JAMES GILLIS, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| UNITED BEHAVIORAL HEALTH ) | |
| operating as OPTUMHEALTH ) | CIVIL ACTION NO. 4:18-cv-00108 |
| BEHAVIORAL SOLUTIONS, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

Plaintiff James Gillis ("Plaintiff") files this Second Amended Complaint against Defendant United Behavioral Health, operating as OptumHealth Behavioral Solutions ("UBH" or "Defendant") seeking relief from Defendant under 502(a)(1)(B) of Employee Retirement Income Security Act to recover benefits due under the terms of his plan. Plaintiff further seeks recovery under section 502(a)(3) for Defendant's breach of fiduciary duty. Plaintiff seeks recovery of all plan payments under section 502(a)(1)(B) that Defendant should have made for Madison Gillis' treatment. Under section 502(a)(3), Plaintiff seeks make-whole relief, surcharge damages, restitution, disgorgement of Defendant's ill-gotten profits, a constructive trust on such ill-gotten profits, and all further relief authorized under ERISA. Plaintiff seeks recoverable court costs and attorneys' fees, among all other forms of appropriate relief available. In support of this Second Amended Complaint, Plaintiff respectfully shows the Court the following:

## I.   PARTIES AND SERVICE

1.   Plaintiff James Gillis is an individual who resides in Van Zandt County, Texas. Plaintiff is a resident and citizen of the State of Texas.

2.   Defendant United Behavioral Health, operating as OptumHealth Behavioral Solutions, is a corporation organized under the laws of California with its principle place of business located in San Francisco, California. This Defendant has made an appearance herein; accordingly, service of process is not required on this Defendant at this time.

## II.   JURISDICTION AND VENUE

3.   Subject matter jurisdiction is proper under 28 U.S.C. § 1331.

4.   Under 28 U.S.C. § 1391(b), venue is proper in this judicial district because a substantial part of the events giving rise to the claims of this action occurred in this district and division. Defendant's intentional and tortious acts were directed toward and have caused injury and death to Madison Gillis in this division and district – namely, Fannin County.

5.   The Court has personal jurisdiction over Defendant herein because the acts complained of were committed in whole or in part by the Defendant in Texas, and the Defendant's intentional and tortious acts were directed toward and have caused injury and death to Madison Gillis in Fannin County.

6.   This Court also has personal jurisdiction over Defendant in this Court because Defendant has made an appearance herein.  Further, Defendant conducts significant operations in this state.  Defendant issued a workplace benefit policy to Raytheon Company employees, an entity with multiple places of business in the DFW metroplex alone.  By doing so, Defendant undertook to make coverage decisions for Plaintiff's dependents in the State of Texas.  Furthermore, two of the denial of claims letters were authored in Texas by Texas medical practitioners, both in Houston, Texas.  Accordingly, the coverage analysis engaged in by Defendant, as specified in detail below,

occurred in the State of Texas, subjecting Defendant to personal jurisdiction in this State. In summary, there is specific personal jurisdiction over Defendant that exists because Defendant's tortious activities occurred in the State of Texas, Defendant undertook to insure individuals in Texas, and Defendant hired and utilized Texas residents to perform the improper analysis the subject of this suit.

7. Moreover, Defendant's extensive contacts in this jurisdiction through, among other things, insuring multitudes of individuals in this State and engaging in systematic activities herein, subject Defendant to general personal jurisdiction in this State.

### III.  FACTS APPLICABLE TO ALL COUNTS

**A. Introduction**

8. Defendant was charged with, and accepted, the obligation to make coverage determinations for major depressive disorder and substance abuse treatment for Raytheon's employees and their dependents. Accordingly, countless children depend on Defendant for important coverage decisions. Madison Gillis was one such individual. In the end, Defendant's malfeasance cost Madison – a fifteen-year-old girl – her life.

9. Defendant claims to have applied Texas' level of care standards in determining coverage. Despite this, Defendant's internal records and testimony prove it failed to properly apply the Texas standards and otherwise failed to meet nationally recognized basic standards of care in performing its obligations.

10. Moreover, in this case, Defendant generated a fraudulent pretext to deny Madison coverage, and used that pretext to deny her every appeal, both an internal appeal and an external appeal. As a result, Madison's father cashed out his 401k in an effort to save her. However, the depletion of his working-class retirement account was insufficient to keep Madison in the treatment program for long. When her father ran out of money, Madison was discharged from her in-patient

facility, Sundown Ranch, after 70 days. Defendant then rejected Plaintiff's request for coverage of day treatment coverage.

11. Nine months later, in a separate incident, Madison's therapist notified Defendant of Madison's elevated risk and poor adherence to treatment. Per expert Marc Fishman MD "[a]t the point that UBH was aware of failing outpatient care and further clinical deterioration in Nov, and at the time that UBH's reviewer noted the need to evaluate for a higher level of care, there was a responsibility to activate a cascade of notifications and outreach in an effort to avert disaster." Defendant failed to activate such notifications or outreach.

12. Madison died on December 11, 2016, after huffing computer cleaning spray, the type of dangerous "self-medication" well known to UBH, her treating doctors, counselors, and therapist.

13. In a cruel twist of bureaucratic irony, nine days after her death, her father received a letter denying his coverage appeal, affirming Defendant's manifestly erroneous position that Madison was not a danger to herself. The external appeal letter incorporated the fraudulent pretext Defendant generated.

### B. Factual Background

14. Madison suffered with depression and significant substance abuse problems – specifically, she suffered from cannabis use disorder, inhalant use disorder, other substance use disorder, combination of substance use disorder, major depressive disorder, recurrent, sever with psychotic features, anxiety disorder, NOS, and insomnia.

15. Following a February 9, 2016 incident at school relating to the possession of drug paraphernalia, she was admitted to Texas Health Behavioral Health Hospital in Arlington. At the urgent insistence of her doctors at Texas Health, who recognized the serious nature of Madison's affliction, she was referred to Sundown Ranch, an in-patient residential rehabilitation facility tailored to address significant substance abuse and co-occurring mental disorders with children.

16. The Texas Health doctor's instruction to Madison's family was to take her to Sundown Ranch immediately and without delay to obtain in-patient treatment for her major depressive disorder and substance abuse issues. Defendant reviewed documents reflecting the urgent nature of the instruction to provide Madison with in-patient treatment. Indeed, Madison's medical records included information that Madison was at a risk of suicide, as she had an "active plan to OD on pills or whatever she can get her hands on."

17. Madison's family immediately followed her doctor's instruction and had her admitted to Sundown Ranch.

18. Despite the urgency of the Texas Health doctor's instruction that Madison receive in-patient treatment, and despite the troubling information relating to Madison's contemplation of suicide, Madison was a patient for just *six days* before Defendant summarily determined that she no longer required further coverage for in-patient treatment.

19. Defendant claimed that "[a]fter talking with your doctor's *assistant*, you have made good progress and no longer need the type of care provided in this setting. While you continue to face challenges as you work on recovery, you have progressed to the point that you are not in immediate danger of hurting yourself." (emphasis added). Essentially every further denial letter would include some aped version of this conclusory proclamation, as if its repeated incantation made it true.

20. On February 23, 2016, due to Madison's serious and potentially harmful mental condition, Sundown Ranch urgently requested – rather, begged for – additional coverage for continued treatment of Madison. Cherye C. Callegan, MD confirmed that Sundown Ranch presented detailed clinical information showing that Madison had significant depression and anxiety and that Madison had identified trauma which she reported was a trigger for her drug use. Sundown Ranch confirmed to Defendant that Madison had not yet worked through the trauma, was having

significant cravings, and had not yet developed coping skills to remain sober from drugs and abstain from self-harming behavior.

21. Despite this clinical information, Defendant made the improper determination to deny Madison the coverage she was entitled to, and which she desperately needed. Every doctor with whom James Gillis spoke about his daughter's condition confirmed that she needed continued coverage. Defendant improperly rejected the clinical evidence provided by Madison's medical doctors at Sundown Ranch and otherwise. Defendant failed to meet the basic level of care guideline analysis with which Defendant was charged, under both the Texas-created standard (which Defendant contends it applied) and the nationally recognized standards of care.

22. Additionally, based on Plaintiff's investigation, it is clear that Defendant engaged in a separate malfeasance. Specifically, the purported "doctor's assistant" that allegedly made a claim about Madison's health was a fabrication – a bureaucratic ghost Defendant generated wholecloth to check a box somewhere in their back office, violating Defendant's fiduciary obligations of truthfulness.

23. In summary, by claiming reliance on the fabricated doctor's assistant statement, which bore no relation to the reality of Madison's condition, Defendant intentionally chose to engage in a fraudulent pretext designed to, and which did, cause injury to Plaintiff, including, among other things, the depletion of James Gillis' 401k account.

24. Madison was discharged from Sundown Ranch after the funds from her father's 401k were exhausted. James Gillis' lifetime of saving for retirement could only keep Madison in treatment for 63 days. During that time, 42 days into her treatment, Madison's counselor concluded "that Madison will need more time in treatment."

25. Then, after having improperly rejected Madison's in-patient treatment, Defendant rejected her partial hospitalization/day treatment coverage. On May 12, 2016, Defendant baldly and

falsely claimed that "your child has progressed to the point that she is not in immediate danger of hurting herself."

26. Months after its initial, improper coverage determination, as well as its separate act of fraud, Defendant failed to meet its fiduciary duty by a new, independent act. Specifically, Madison visited a therapist during November of 2016, who sent UBH an alert identifying clinical risk Madison faced on or about November 17, 2016. UBH internally marked the notice as "ALERT High Risk." On the heels of receiving the High Risk Alert, on November 29, 2016 this therapist notified Defendant of Madison's urgent, elevated risk and poor adherence to treatment – her treatment was failing, and dangerously so. The therapist noted, "severe depressed mood, mood changes, anxiety, verbally aggressive behaviors, changes in sleep."

27. Defendant's internal designation of this notification *appears* appropriately urgent, described as, "**ALERT Clinical Outreach Intervention.**" (emphasis in original). Based on Defendant's own description, it is clear that Defendant was provided actual notice of a clear and present danger to Madison, that its coverage determination was failing and inaccurate, and that the matter needed to be urgently addressed.

28. Defendant's internal notes reflect the following upon this notice: "Follow-Up Rationale and Actions: CA recommendations: attempt to contact mbr/mbr's parents to see if they are wanting to continue in tx – discuss continuing at higher frequency, continue to evaluate for HLOC [*i.e.*, Higher Level of Care]."

29. Despite the urgent internal desigantions given to these events, such as "ALERT," "Intervention" and "High Risk," which show that Defendant recognized it must take action, make contact with James Gills, and evaluate for a higher level of care, *Defendant did nothing*. This internally generated note is the last that appears in the administrative record.

30. Per expert Marc Fishman, MD "[a]t the point that UBH was aware of failing outpatient care and further clinical deterioration in Nov, and at the time that UBH's reviewer noted the need to evaluate for a higher level of care, **there was a responsibility to activate a cascade of notifications and outreach in an effort to avert disaster**." (emphasis added). No such notification or outreach effort occurred. James Gillis was not notified.

31. Approximately three weeks after the alarm bells should have been sounding in UBH about Madison's situation, she succumbed to her treatable (and ostensibly covered) illness and died.

32. Nine days after her death, and five days before Christmas 2016, Plaintiff received the results of the external appeal, to which beneficiaries are entitled  The third-party appeal concluded that Madison was not a danger to herself from her substance abuse problem. It relied on the fraudulent "doctor's assistant" statement that Madison had the ability to stabilize. There is no evidence in the administrative record indicating that UBH provided information on the high alert (received in November 2016) to the third-party performing the appeal.

33. Madison's death was a direct and proximate result of Defendant's conduct.

C. **Defendant's Failure to Meet The Standard of Care**

34. Generally accepted standards of assessing the appropriate level of mental healthcare for minors, such as Madison Gillis, are promulgated by the American Academy of Child and Adolescent Psychiatry ("AACAP") and by the American Association of Community Psychiatrists ("AACP"). Texas has created certain leval of care guidelines as well for these purposes, and the Texas Legislature has confirmed that the Texas based standards "accord with national standards for clinical and social prevention, intervention and treatment" of substance abuse disorders, such as those promulgated by AACAP and AACP. 24 Tex. Reg. at 713.

35. In this case Defendant purported to use the substance abuse disorder treatment using criteria issued by the Texas Department of Insurance, rather than its internal guidelines. 28 TEX. ADMIN. CODE§ 3.8011 (1991).

36. AACAP's Practice Parameter for the Assessment and Treatment of Children and Adolescents With Depressive Disorders explains that the appropriate level of care is driven by a multitude of considerations, including "the subject's age and cognitive development, severity and subtype of depression, chronicity, comorbid conditions, family psychiatric history, family and social environment, family and patient treatment preference and expectations, cultural issues, and availability of expertise in pharmacotherapy and/or psychotherapy." AACAP adds that "the decision for the level of care will depend primarily on level of function and safety to self and others, which in turn are determined by the severity of depression, presence of suicidal and/or homicidal symptoms, psychosis, substance dependence, agitation, child and parents' adherence to treatment, parental psychopathology, and family environment."

37. The Child and Adolescent Level of Care Utilization System (CALOCUS), now also known as CASII, is a "dimensional rating system used to determine the intensity of a child or adolescent's service needs" developed by AACAP and AACP. CALOCUS has six dimensions: (1) risk of harm; (2) functional status; (3) co-morbidity; (4) recovery environment; (5) resiliency and treatment history; and (6) acceptance and engagement. "Each dimension has a five-point rating scale, from least to most severe. For each of the five possible ratings within each dimension, a set of criteria is clearly defined.  Only one criterion needs to be met for that rating to be selected, and for each dimension, the highest rating in which at least one of the criteria is met is the rating that should be assigned." A rating of 4 out of 5 in any of the first three dimensions automatically necessitates placement in residential treatment, independent of any other factors. CALOCUS notes, "[i]n most

cases, the higher level of care should be selected, unless there is a clear and compelling rationale to do otherwise."

38.     Similarly, the Level of Care Utilization System for Psychiatric and Addictive Services ("LOCUS"), developed by AACP for use in adult populations, notes: "[T]he highest score in which it is more likely than not that at least one criterion has been met should generally be assigned. The result will be that any errors will be made on the side of caution . . . **In most cases, the higher level of care should be selected, unless there is a clear and compelling rationale to do otherwise.**" (emphasis added). CALOCUS explicitly adds that "it may be desirable for a child or adolescent to remain at a higher level of care to preclude relapse and unnecessary disruption of care, and to promote lasting stability."

### D.  Defendant's Failure to Meet the Texas Guidelines

39.     In this case, the UBH denial did not conform to the Texas Standards. Specifically, the UBH denial of residential level of care treatment for Madison Gillis did not conform with the criteria for SUD treatment placement identified by the Texas Administrative Code under the Texas Comission on Alcohol and Drug Abuse (TCADA) Guidelines. Under section 3.8011, and according to expert Marc Fishman, MD, Madison certainly met criteria for admission to residential SUD treatment. Although UBH did initially approve her as meeting admission criteria when first admitted to Sundown, 6 days later, when she was denied coverage, she continued to meet those admission criteria, according to Fishman. According to Dr. Fishman, within the time of the psychiatric hospitalization and the additional short time of less than a week in residential treatment, the non-acute, non-emergency goals of residential treatment articulated in the Texas criteria for residential admission had not been fully met. At the time of UBH's denial, Madison had not yet developed the problem solving or coping skills necessary to prevent relapse, rendering the denial improper. Madison's past course of illness with repeated relapse and sub-optimal response to prior

episodes of brief acute treatment clearly demonstrate her enduring lack of such skills and her enduring proclivity to replace to both substance use and co-morbid dpepression. Further, according to Fishman, "based on her history and course of illness, this predictable relapse had high risk of persistent sever funcational impairment, of **potentially dangerous self-harm, and of potentially dangerous intoxication**." (emphasis added).

40. Moreover, according to section 3.8014, the recommended length of residential stay for inpatient rehabilitation/treatment in a hospital or 24-hour residential setting is between 14 and 60 days. The UBH denial clearly failed to fit within this timeframe.

E. **Defendant's Deviation from Generally Accepted Standards of Care**

41. UBH was recently sued in a class action lawsuit that alleged that Defendant developed its own Level of Care ("LOC") guidelines that Defendant uses to determine whether any given level of mental health treatment is covered by the health insurance plans that Defendant is charged with administering. Among the LOC Guidelines authored by Defendant are those for "Acute Inpatient" and "Residential Treatment." Plaintiff timely opted out of the class.

42. In summary, important ways that UBH's internal criteria deviate from the generally accepted standards of care include:

    i. Inappropriate focus on acuity and crisis;

    ii. Central misapplied focus on the idiosyncratic concept of "why now";

    iii. Inappropriate focus on imminent harm;

    iv. Lack of separate criteria for adolescents/youth;

    v. Skewed distinction between "active treatment" versus "custodial care."

43. According to Dr. Fishman, the core flaws in the UBH criteria – including inappropriate and near exclusive focus on acute crisis, the concept of imminent harm and "why now" and an overly narrow view of active treatment – produce a clear, overall, aggregate, and

systemic message of restricting access to care. "Based on a review of the denials here, it is clear that even when UBH cites the Texas standards, the systemic biases reflected in the UBH Guidelines apply with equal force," Fishman confirms. Accordingly, Fishman concludes, "as confirmed by UBH's denial letters issued to the Gillis family, under either the Texas standards or UBH's Guidelines, UBH has an inherent bias in favor of lower levels of care, rather than a thoughtful weighing of the likelihood of success and likelihood of non-success of the alternatives as a basis for treatment matching." Generally accepted standards of care require interventions that are most likely to restore function or to prevent deterioration of function. "The prescription that it is inherent in the UBH Guidelines, or in UBH's application of the Texas standards, is to authorize only the minimum intervention to avoid *immediate* disaster," Fishman explains.

44. According to Fishman, among other specific failures, UBH's statements in its denial letters betray the innapropriate biases of over-restrictiveness in the UBH interpretation of the criteria in its decision-making. The denials fail to recognize that lower levels of treatment following acute crises have been too low and predictablty will likely be again. The denials futher fail to acknowledge the evidence in the course of Madison's illeness and her presentation that deterioration is likely imminent.

45. Based on the foregoing, Plaintiff brings the following claims.

### IV. CLAIM

**COUNT ONE: CLAIM FOR PLAN BENEFITS UNDER ERISA § 502(A)(1)(B).**

46. Plaintiff realleges and restates the foregoing paragraphs as if set forth fully herein.

47. Plaintiff is a participant or beneficiary within the meaning of ERISA Section 502(a)(1)(B), and as such he is authorized to bring this civil action against Defendant to recover all benefits due and that should have been paid under the terms of his plan and to enforce his rights under the terms of the plan but for Defendant's conduct.

48. Plaintiff has been harmed by the improper denial of claim benefits occasioned by Defendant's deviation from generally accepted standards of care and its failure to properly apply the Texas standards.

49. Plaintiff seeks recovery of the lost plan benefits, plus attorney's fees, and any and all additional relief, at law and in equity, to which Plaintiff is justly entitled.

**COUNT TWO: BREACH OF FIDUCIARY DUTY UNDER ERISA § 502(A)(3).**

50. In addition and/or the alternative to the foregoing, Plaintiff hereby incorporates and realleges the matters set forth in the preceding paragraphs as if set forth at length.

51. This count is brought pursuant to ERISA § 502(a)(3).

52. As an ERISA fiduciary, and pursuant to 29 U.S.C. Section 1104(a), Defendant is required to discharge its duties "solely in the interests of the participants and beneficiaries" and for the "exclusive purpose" of providing benefits to participants and their beneficiaries" and paying reasonable expenses of administering the plan. Defendant must do so with reasonable "care, skill, prudence, and diligence" and in accordance with the terms of the plan it administers. Defendant must conform its conduct to a fiduciary duty of loyalty and may not make misrepresentations to its insured.

53. As an entity responsible for making mental health and substance abuse benefit determinations under Plaintiff's Plan, and responsible for developing internal practices and policies to facilitate such determinations, Defendant is an ERISA fiduciary.

54. In this case, Defendant breached its fiduciary duty to Plaintiff by generating then purporting to rely on a fraudulent pretext in its numerous denial letters.

55. After Madison Gillis was admitted to Texas Health Behavioral Health Hospital in Arlington, her doctors urgently referred her to Sundown Ranch, an in-patient residential rehabilitation facility tailored to address significant substance abuse problems with children.

56. Despite the urgency of the Texas Health doctor's instruction that Madison receive in-patient treatment, Madison was a patient for just *six days* before Defendant summarily claimed that "[a]fter talking with your doctor's *assistant*, you have made good progress and no longer need the type of care provided in this setting. While you continue to face challenges as you work on recovery, you have progressed to the point that you are not in immediate danger of hurting yourself." (emphasis added).

57. Defendant would also similarly, and falsely write, "[a]fter talking with your doctor's assistant, your child has made good progress with her acute mental health problems and history of substance abuse. She was reported to be medically and psychiatrically stable enough to be discharged from the mental health inpatient level of care."

58. There was no such doctor's assistant at Sundown Ranch. This communication did not occur and has been denied by the employees of Sundown Ranch. Madison had not made "good progress" and she had not developed the ability to stabilize after a mere six days.

59. Madison's counselor has confirmed that such a communication would never have occurred. Indeed, on February 23, 2016, due to Madison's serious and potentially harmful mental condition, Sundown Ranch doctors urgently sought additional coverage for her continued treatment. Sundown Ranch presented detailed clinical information showing that Madison had significant depression and anxiety and that Madison had identified trauma which she reported was a trigger for her drug use. Sundown Ranch confirmed to Defendant that Madison had not yet worked through the trauma, was having significant cravings, and had not yet developed coping skills to remain sober from drugs and abstain from self-harming behavior – in short, Defendant's claim was false.

60. Despite this, by relying solely on a purported conversation with a doctor's assistant, Defendant made the self-serving determination to harm its beneficiaries in an expedient fraud. Every doctor with whom James Gillis spoke about his daughter's condition confirmed that she

needed continued coverage – based on Plaintiff's investigation, no "doctor's assistant" made the claims Defendant's claim to rely upon.

61. The internal appeal within UBH relied upon and incorporated the fraudulent statement attributed to the "doctor's assistant."

62. Then, the third-party external appeal, by a company called MCMC, incorporated and relied upon the statements falsely attributed to the "doctor's assistant." Accordingly, as a direct result of UBH's fraud, Plaintiff was wholly denied the right of a third-party independent appeal.

63. In summary, by claiming reliance on the statement of a non-existent doctor's assistant, which bore no relation to the reality of Madison's condition, Defendant intentionally chose to engage in a fraudulent pretext which was reasonsbly foreseeable to, and which did, injure Plaintiff.

64. Madison was discharged from Sundown Ranch after the funds from her father's 401k were exhausted. James Gillis' lifetime of saving for retirement could only keep Madison in the treatment Defendant wrongfully denied for 63 days.

65. The fraudulent pretext kept Madison out of treatment, but more than that, the existence of the fraudulent statement precluded a meaningful review, and the resulting delay (and ultimate loss of the right to an independent third-party appeal), led directly to Madison's death.

66. Madison died on December 11, 2016 as a direct and proximate result of Defendant's conduct.

67. On information and belief, Defendant's desireability to Raytheon (and its other clients) as a plan fiduciary and administrator is impacted and informed by the overall payments that Raytheon (and the other clients) must make to beneficiaries under the plan, such that the higher payments Raytheon must make due to Defendant's administration, the less desireable Defendant's services become to Raytheon. Accordingly, Defendant's incentive is to keep Raytheon's plan

payments as low as possible to retain Raytheon as a client. Defendant thus receives a benefit from engaging in activities such as those set forth herein, including the fraudulent pretext identified herein. Defendant's profit made at the expense of those to whom it owes fiduciary duties must be disgorged.

68. Plaintiff may pursue this claim for breach of fiduciary duty and seek surcharge in this matter because no other relief is available or adequate under the facts giving rise to the breach of fiduciary duty cause of action. Defendant's actions alleged hereunder constitute extraordinary circumstances within the meaning of that term as construed under the law. Defendant significantly and deliberately misled the beneficiaries, improperly influenced the third-party appeal, and the diligence Defendant performed in considering Madison's condition, and otherwise. As such, the beneficiaries may bring suit for breach of fiduciary duty.

69. In addition to the fraudulent pretext by which Defendant breached its fiduciary duty, Defendant engaged in a separate, harmful act occuring nine months later. Specifically, Madison visited a therapist during November of 2016, who sent UBH an alert identifying clinical risk Madison faced on or about November 17, 2016. UBH internally marked the notice as "ALERT High Risk." On the heels of receiving the High Risk Alert, on November 29, 2016 this therapist provided a detailed notification to Defendant of Madison's urgent, elevated risk and poor adherence to treatment – her treatment was failing dangerously. In its "**ALERT Clinical Outreach Intervention**" note, Defendant internally identified its obligation to review for higher level of care and to notify Madison's parents. Defendant owed a fiduciary responsibility to activate a cascade of notifications and outreach in an effort to avert disaster. Despite recognizing its duty, no such notification or outreach effort occurred. James Gillis was not notified. Approximately three weeks after UBH was notified (and did nothing) Madison succumbed to her treatable illness and died.

70. As a result of Defendant's breaches of fiduciary duty, Plaintiff requests the relief identified herein, including all relief available in equity, including the imposition of a constructive trust on Defendant's ill-gotten profits generated in connection with its breaches of fiduciary duty, disgorgement of its profits, and all relief that is "well within the power of federal courts" to grant as recognized under *Ingersoll Rand Co. v. McClendon*, 111 S.Ct. 478, 480 (1990). Plaintiff is entitled to "make whole" relief, including the return of investment income from Plaintiff's 401k and the lost economic benefit arising from Madison's death. Without limitation, Plaintiff seeks disgorgement of Defendant's ill-gotten profits, a constructive trust on such ill-gotten profits, and all further relief authorized under ERISA, such as surcharge damages, restitution, make-whole relief, and recoverable court costs, attorneys' fees, among all other forms of appropriate relief available.

## V. REQUEST FOR RELIEF

71. Considering the premises, Plaintiff respectfully requests that upon trial this Court enter a judgment in favor of Plaintiff against Defendant for the following relief:

    a. Awarding all payments that should have been made for the treatment of Madison Gillis;

    b. Imposing a constructive trust and disgorgement of Defendant's ill-gotten profits as a consequence of Defendant's breach of fiduciary duty;

    c. Imposing the remedy of surcharge as authorized under *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 450 (5th Cir. 2013);

    d. Awarding all relief of the type that would have typically been available in a traditional court of equity (*see, e.g., Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 450 (5th Cir. 2013));

    e. Awarding all "make whole" damages to the extent such are authorized under *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 450 (5th Cir. 2013);

    f. Awarding all relief that is within the power of federal courts to grant as recognized under *Ingersoll Rand Co. v. McClendon*, 111 S.Ct. 478, 480 (1990);

    g. Awarding Plaintiff's reasonable costs and expenses for this action, including reasonable counsel fees, in an amount to be determined by the Court, pursuant to 29 U.S.C. 1132(g);

      h.      Granting such other and further relief as is just and proper; and

      i.      Such other and further relief, at law and/or in equity, and available under the ERISA statutes, to which Plaintiff may be entitled and which this Court deems just and fair.

Respectfully submitted,

By: /s/ *Peyton J. Healey*
      Peyton J. Healey
      State Bar No. 24035918
      peyton@powerstaylor.com

      POWERS TAYLOR LLP
      Campbell Centre II
      8150 North Central Expressway
      Suite 1575
      Dallas, Texas 75206
      Phone: 214.239.8900
      Fax: 214.239.8901

**COUNSEL FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that on this 7th day of December 2018, the forgoing document was served on all counsel of record via the Court's CM/ECF system.

*Peyton Healey*
Peyton Healey